# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| Candice Mumma, | |
| Plaintiff, | Civil No. 3:20-cv-00926 (TOF) |
| v. | |
| Pathway Vet Alliance, LLC, *et al.*, | January 4, 2023 |
| Defendants. | |

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I.   INTRODUCTION

The Plaintiff, Candice Mumma, is a conservative Christian woman who posted a controversial meme on her personal Facebook page.  Her employer saw it, concluded that it was offensive to transgender individuals and to Native Americans, and fired her three days later.  Ms. Mumma sued, alleging that her termination violated Section 31-51q of the Connecticut General Statutes, a law that extends First Amendment protections to private workplaces.  She also alleged common-law, state-law claims for breach of contract, breach of the covenant of good faith and fair dealing, negligent misrepresentation, intentional infliction of emotional distress, and negligent infliction of emotional distress.

The Defendants, Pathway Vet Alliance, LLC and National AVC, LLC d/b/a THRIVE Affordable Vet Care (together, "Thrive"), have moved for summary judgment, seeking dismissal of all of Ms. Mumma's claims.  (Mot. for Summ. J., ECF No. 49, at 2.)  For the reasons set forth below, Thrive's motion will be denied as to the Section 31-51q claim in Count One of the complaint, but granted with respect to the common law claims in Counts Two through Six.

## II.    BACKGROUND

The following facts come from the parties' Local Rule 56 statements and accompanying exhibits.  The Defendants are two affiliated Texas limited liability companies that operate veterinary hospitals.  National AVC, LLC d/b/a THRIVE Affordable Vet Care ("National") establishes new hospitals, and Pathway Vet Alliance, LLC ("Pathway") acquires existing veterinary practices.  (Depo. Tr. of C. Mumma, ECF No. 49-12, at 19:16-20.)  On November 12, 2018, National hired Ms. Mumma as a "support staff talent acquisitions recruiter."  (*See id.* at 18:24-25, 19:1-2.)  Her principal job duties were to "interview candidates that applied for positions that were posted, and, if they met set criteria, pass them on to the manager to take over the hiring process."  (*Id.* at 19:4-9.)  Over the course of her employment at National – and at Pathway, to which she switched in 2020 – she was responsible for filling "[a]nywhere from 10 to 40" positions each week.  (*Id.* at 22:5-8, 38:6-21.)

At the beginning of her employment, Thrive provided Ms. Mumma with an employee handbook.  (Defs.' Ex. 2, ECF No. 49-4; Depo. Tr. of C. Mumma, ECF No. 49-12, at 45:5-21.)  The handbook included Thrive's policies on equal employment opportunity, employee conduct, anti-harassment and non-discrimination, and social media use.  (Defs.' Ex. 2, ECF No. 49-4.)  The equal opportunity policy stated:

> THRIVE believes that all persons are entitled to equal employment opportunity and does not discriminate against its employees or applicants because of such individual's race, color, religion, sex (including gender), sexual orientation, national origin, ancestry, age, marital status, disability, veteran status, genetic information, or any other basis prohibited by federal, state or local law.  Equal employment opportunity will be extended to all persons in all aspects of the THRIVE-employee relationship, including recruitment, employment, training, promotion, transfer, corrective action, working conditions, compensation, employee benefits, layoff, and termination.

(*Id.* at 7.)  The employee conduct policy provided examples of workplace behaviors that could "result in corrective action, up to and including termination of employment," such as "[u]se of . . .

2

offensive . . . language," "[b]ehavior that disrupts the workplace," and "[b]ehaviors that violate the Workplace Violence and Unlawful Harassment policies." (*Id.* at 28-29.)  The anti-harassment policy defined impermissible harassment to include "epithets," "slurs or negative stereotyping," and "denigrating jokes and display or circulation in the workplace of written or graphic material that denigrates or shows hostility or aversion toward an individual or group." (*Id.* at 31.)  The social media policy warned that "any of your conduct that adversely affects your job performance, the performance of fellow associates or otherwise adversely affects members, customers, suppliers, people who work on behalf of THRIVE or THRIVE's legitimate business interests may result in disciplinary action up to and including termination." (*Id.* at 49.)

The employee handbook also made clear that employment at Thrive was "at-will."  In bold type, it stated that "[u]nless you have a written contract providing otherwise, your relationship with THRIVE is 'at-will' and may be terminated at any time by either you or THRIVE, with or without prior notice or warning, and with or without cause or reason." (*Id.* at 6.)  The handbook went on to say that "[n]othing in this manual will limit your right or the Company's discretionary right to terminate your employment relationship," and "no manager, supervisor, or employee of THRIVE has any authority to enter into any oral agreement providing otherwise." (*Id.*).  Ms. Mumma read the at-will provision around the time she started (*see* Depo. Tr. of C. Mumma, ECF No. 49-12, at 45:5-21), and understood it to mean that "THRIVE may terminate your employment at any time with or without cause." (*Id.* at 46:3-12.)

At the beginning of her employment, Ms. Mumma reported to Dr. Christina Moore, Thrive's director of talent acquisition. (*Id.* at 46:22-23.)  By all accounts, Ms. Mumma was an effective and conscientious employee.  Dr. Moore testified that she "was a very hard worker and very successful in technician recruiting." (Depo. Tr. of C. Moore, ECF No. 54-4, at 42:19-20.)

The doctor added that Ms. Mumma "was very enthusiastic about . . . building positive cultures within our teams, and so she was happy to contribute to any of the . . . campaigns and the efforts we put in place to promote a positive workplace." (*Id.* at 58:22-59:1.)  In 2019, Ms. Mumma received a $1,000 bonus for "going above and beyond" in training two fellow employees.  (Depo. Tr. of C. Mumma, ECF No. 49-12, at 51:1-14.)

Ms. Mumma describes herself as a politically conservative Christian woman. (*Id.* at 107:9-11; *see also* Depo. Tr. of C. Mumma, ECF No. 54-1, at 182:6-8.)  She says that her "political direction comes from what is stated in the Bible, therefore, many of [her] beliefs are based off of what the Bible says is right versus wrong." (Depo. Tr. of C. Mumma, ECF No. 49-12, at 108:9-12.)  She claims to have observed one of Thrive's founders, Shawn McVey, making politically charged comments on his social media accounts. (Depo. Tr. of C. Mumma, ECF No. 54-1, at 171-73).  She also says that her other co-workers actively posted, forwarded, and shared politically liberal social media messages.  (Compl., ECF No. 1, ¶ 27.)  She alleges that these and other cues amounted to an "assur[ance]" that she "was free to express her political and personal opinions in the workplace and otherwise without repercussions." (*Id.* ¶ 79.)

On the evening of June 9, 2020, Ms. Mumma posted a meme to her personal Facebook page. (Depo. Tr. of C. Mumma, ECF No. 49-12, at 106:14-19, 123:2-3; *see also* Defs.' Ex. 5, ECF No. 49-7.)  Under a banner reading "No Wonder Liberals Are So Confused," the meme contained photos of eight different political and cultural figures with a single word under each.  For example, a picture of former NAACP Spokane chapter president Rachel Dolezal was captioned "Black;" a picture of former Vice President Al Gore was captioned "scientist;" and a picture of former President Bill Clinton was captioned "husband."  Most relevant to this case, a photo of Senator

Elizabeth Warren was accompanied by the word "Indian," and a photo of Caitlyn Jenner was captioned "woman."  The meme is reproduced here:



Dr. Moore saw the meme on either June 9 or June 10.  (*See* Depo. Tr. of C. Moore, ECF No. 49-14, at 90:24-91:2, 91:24-25.)  She testified that when she first saw it, she "had some concerns because [she] could see how people would find it offensive."  (*Id.* at 91:24-92:3.)  She was particularly concerned about the Jenner and Warren panels, because she regarded them as "potentially very offensive to protected classes of people."  (*Id.* at 101:17-22.)  With respect to the Warren panel, Dr. Moore observed that the use of the term "Indian" in place of "Native American" "can be taken offensively," but "[i]t was more that the . . . goal of this meme was to question how people identify themselves."  (*Id.* at 103:7-14.)  And with respect to the Jenner panel, Dr. Moore "personally [found] it offensive to question how a transgender person chooses to identify themselves."  (*Id.* at 103:23-104:2.)  She decided to call Human Resources, and ultimately spoke

with the company's vice president for "People Operations Partners," Tracey Shields. (*Id.* at 91:14-18, 100:1-9.)

Before Dr. Moore reached Ms. Shields, however, she began to receive complaints from other Thrive employees who had seen the meme. Lee Pitts found it "offensive," particularly the Jenner panel. (*Id.* at 94:22-95:6.) Sara Lisak "was really disappointed" and "surprised" because "she wouldn't expect this from Candice," and she regarding the meme as "hateful and derogatory." (*Id.* at 96:9-18.) Chrissy McGregor "also expressed disappointment . . . and confusion . . . and she shared . . . that she just wouldn't have expected such a harmful or hurtful post from Candice toward so many people." (*Id.* at 97:15-21.) Another employee, Kendra Williams, complained in an e-mail that the meme was "hateful, intolerant and anti-inclusive – specifically to our transgendered community."[1] (Defs.' Ex. 6, ECF No. 49-8.) Dr. Moore grew concerned "that the members of the team would not be able to work closely with [Ms. Mumma], trust her, have a good, open working relationship with her," but at her deposition she conceded that none of those people "expressed to [her] directly that they would not be able to work with Candice going forward." (Depo. Tr. of C. Moore, ECF No. 49-14, at 112:22-113:12, 114:12-15.)

Dr. Moore and Ms. Shields discussed the meme, and afterwards Ms. Shields convened a videoconference with Ms. Mumma on June 11, 2020. (*See* Defs.' Ex. 7, ECF No. 49-9.) Also in attendance was Raechel Kelley-Valles, who had become Ms. Mumma's direct supervisor earlier that year. (*Id.*) Ms. Shields says that, during this meeting, she "explained to Candice why the meme had some content that can be seen as offensive." (*Id.*) She "specifically described that the photo of Elizabeth Warren had the term Indian under it which can be seen as a negative term as

---

[1]     Dr. Moore also spoke with a fifth employee, Christine Markulis, but she could not remember any of the specifics of the conversation at her deposition. (*Id.* at 98:20-24.)

the term most appropriate would be Native American." (*Id.*)  She "also described the photo of Caitlyn Jenner and the word Women [sic] under it implied that she could not be considered a woman which could show intolerance for the transgender community." (*Id.*)  She explained that Ms. Mumma "is in a very visible role as a recruiter in which we need to be aware of diversity, equity, and inclusion," and that her post – "which is on a public Facebook page open to everyone" – "could be seen by potential candidates and in fact was seen by several employees who became upset by this content." (*Id.*)  For her part, Ms. Kelley-Valles asked Ms. Mumma if she "would consider making her Facebook private," but Ms. Mumma said she would not. (*Id.*)

After this videoconference, Ms. Shields, Ms. Kelley-Valles, and Dr. Moore decided to terminate Ms. Mumma's employment, with input from Andrea Clayton, Thrive's "Chief People Officer." (Depo. Tr. of C. Moore, ECF No. 49-14, at 108:1-8.)  At their depositions, Ms. Shields and Dr. Moore cited somewhat different reasons for the termination.  Ms. Shields explained that "Candice was separated for posting material to her Facebook page, specifically, two boxes contained within a meme that was offensive and did not comply with our employee handbook standards, our values, and showed disregard for diversity, equity, and inclusion." (Depo. Tr. of T. Shields, ECF No. 49-13, at 11:7-12.)  When asked whether "it was the posting of the meme . . . that led to Candice being terminated by Thrive," she responded, "Correct." (*Id.* at 82:11-14.)  Dr. Moore did not cite handbook standards or company values, but instead said that Ms. Mumma was terminated because she "posted something to social media that was offensive and derogatory towards multiple groups of people." (Depo. Tr. of C. Moore, ECF No. 49-14, at 87:7-12.)  In any event, Ms. Shields communicated the termination decision to Ms. Mumma in a second videoconference on June 12, 2022. (Defs.' Ex. 8, ECF No. 49-10 at 9-11.)

Ms. Mumma filed this lawsuit on July 7, 2020.  In Count One of her six-count complaint, she alleged that her "posting of the meme at issue was an exercise of her rights protected by the First Amendment to the United States Constitution and Sections 3, 4, and 14 of Article First of the Connecticut Constitution."  (Compl., ECF No. 1, ¶ 59.)  She asserted that, "[i]mmediately after engaging in constitutionally protected speech, the Defendants, through their supervisors retaliated against [her] by terminating her employment."  (*Id.* ¶ 62.)  She claimed that "[t]he Defendant's decision to terminate [her] employment was in violation of Connecticut General Statutes § 31-51q," which prohibits employers from subjecting employees to "discipline or discharge on account of" their exercises of free speech rights.  (*Id.* ¶¶ 64, 54.)

Ms. Mumma also alleged five other causes of action.  She asserted a claim for breach of contract in Count Two, contending in substance that the Thrive employee handbook contained an enforceable promise that employees could "feel free to raise issues of concern without fear of reprisal," a promise that Thrive allegedly breached when it terminated her for posting the meme. (*Id.* Count Two & ¶ 68.)  In Count Three, she alleged that Thrive breached the covenant of good faith and fair dealing when it undertook "discretionary acts of discipline against [her] in violation of the terms of the Handbook between the parties or the spirit of the agreement."  (*Id.* Count Three & ¶ 76.)  In Count Four, she claimed that Thrive committed the tort of negligent misrepresentation when it "made numerous representations of fact . . . that were false and misleading, including assuring the Plaintiff that she was free to express her political and personal opinions in the workplace and otherwise without repercussions."  (*Id.* Count Four & ¶ 79.)  And in Counts Five and Six, she alleged that Thrive committed the torts of intentional and negligent infliction of emotional distress when, among other things, they "demanded that [she] refute her personal,

religious and political views that did not comport with the accepted ideology[.]" (*Id.* Counts Five, Six & ¶¶ 89, 100.)

Thrive answered the complaint on September 25, 2020. (Answer, ECF No. 12.) It denied the material allegations in each count, and it asserted several affirmative defenses. (*Id.*) After the Rule 26(f) conference, the parties consented to the jurisdiction of a Magistrate Judge, and Judge Chatigny transferred the case to the undersigned. (ECF No. 22.)

The parties then completed discovery and Thrive moved for summary judgment. (Mot. for Summ. J., ECF No. 49.) Ms. Mumma filed an opposition (Opp'n, ECF No. 55), and Thrive filed a reply. (Reply, ECF No. 57.) The Court heard more than an hour of oral argument and took the motion under advisement. (Minute Entry, ECF No. 60.) This ruling resolves the motion.

## III.   DISCUSSION

### A.   Jurisdiction

The Court begins by considering whether it has jurisdiction over Ms. Mumma's claims. In her complaint, she alleges that "[t]his Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 (diversity) because the parties are citizens of different states and the amount in controversy exceeds $75,000." (Compl., ECF No. 1, ¶ 3.) She also says that "[t]his Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 (federal question) because Connecticut General Statutes § 31-51q implicates the protections afforded by the First Amendment to the United States Constitution." (*Id.* ¶ 4.) Finally, she "requests that this Court exercise supplemental jurisdiction over her state law claims pursuant to 28 U.S.C. § 1367." (*Id.* ¶ 5.)

Thrive does not challenge any of this (*see* Rule 26(f) Rpt. of Parties' Planning Mtg., ECF No. 14, at 2), but even where the parties agree, federal courts "are obliged to satisfy [them]selves that jurisdiction exists." *Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt.*, 692

F.3d 42, 48 (2d Cir. 2012).  This rule flows from the principle that a "failure of subject matter jurisdiction is not waivable," *Lyndonville Sav. Bank & Tr. Co. v. Lussier*, 211 F.3d 697, 700 (2d Cir. 2000), and from the principle that "[a] party seeking to invoke the subject matter jurisdiction of a Court has the burden of demonstrating that there is subject matter jurisdiction in the case." *Shenandoah v. Halbritter*, 366 F.3d 89, 91 (2d Cir. 2004).

In this case, Ms. Mumma has not shown the existence of diversity jurisdiction.  28 U.S.C. 1332 provides that "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States."  The Supreme Court "has interpreted 'citizens of different States' to grant jurisdiction only 'if diversity of citizenship among the parties is complete, *i.e.*, only if there is no plaintiff and no defendant who are citizens of the same State." *Platinum-Montaur Life Scis., LLC v. Navidea Biopharm., Inc.*, 943 F.3d 613, 617 (2d Cir. 2019) (quoting *Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381, 388 (1998)).  The citizenship of an LLC "is determined by the citizenship of each of its members," and a complaint is "deficient" if it "contains no allegation as to the identity or citizenship of" the members.  *Carter v. Healthport Techs., LLC*, 822 F.3d 47, 60 (2d Cir. 2016); *see also Am. Commerce Ins. Co. v. Bronko Constr. LLC*, No. 3:21-cv-1640 (CSH), 2022 WL 313885, at *2 (D. Conn. Feb. 2, 2022) (holding that a claim premised on diversity jurisdiction could not proceed where the plaintiff had not "establish[ed] the identities and citizenship of each member of each Defendant limited liability company").  Here, Ms. Mumma's complaint alleges that the two Defendant LLCs are registered in Delaware and have principal places of business in Texas (Compl., ECF No. 1, ¶¶ 8, 9), but it says nothing about the identity or citizenship of the LLCs' members.  Her complaint therefore does not establish diversity

jurisdiction.  *See, e.g., Allard v. Lowe's Home Ctr., LLC*, No. 3:22-cv-179 (CSH), 2022 WL 625730, at *34 (D. Conn. Feb. 11, 2022); *Am. Commerce Ins. Co.*, 2022 WL 313885, at *2.

The Court does, however, have federal question jurisdiction over her Section 31-51q claim to the extent that it is founded on the First Amendment to the United States Constitution.  Although Section 31-51q is of course a state rather than a federal statute, state law claims can raise federal questions when their "vindication . . . necessarily turn[s] on some construction of federal law." *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 9 (1983).  More specifically, "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013).  Applying these principles, the Second Circuit has held that a state-law claim based on Section 31-51q and the First Amendment creates a federal question because it "requires that a court construe federal First Amendment law and evaluate its scope." *Bracey v. Bd. of Educ.*, 368 F.3d 108, 116 (2d Cir. 2004) (internal quotations and brackets omitted).  And district courts have reached the same conclusion even when, as here but not in *Bracey*, the plaintiff was a private-sector employee who did not have a federal cause of action under 42 U.S.C. § 1983.  *See, e.g., Manning v. Cmty. Solutions, Inc.*, No. 3:20-cv-337 (VAB), 2022 WL 2791858, at *12 n.8 (D. Conn. July 15, 2022); *Konspore v. Friends of Animals, Inc.*, No. 3:10-cv-613 (MRK), 2012 WL 965527, at *15–16 (D. Conn. Mar. 20, 2012).  While federal courts may not have jurisdiction over Section 31-51q claims premised exclusively on the free speech provisions of the Connecticut Constitution, *see, e.g., Dalling v. Town of Fairfield*, No. 3:22-cv-185 (JAM), 2022 WL 909393, at *3-4 (D. Conn. Mar. 29, 2022), in this case Ms. Mumma expressly bases her claim on the federal as well as the state constitution.  (Compl., ECF No. 1, ¶ 59.)  The Court therefore has federal

question jurisdiction over her Section 31-51q claim pursuant to 28 U.S.C. § 1331.  *Bracey*, 368 F.3d at 116.

The Court will also exercise supplemental jurisdiction over Ms. Mumma's state-law, common-law claims.  28 U.S.C. § 1367 provides that, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  Put differently, "a federal court has jurisdiction over an entire action, including state-law claims, whenever the federal-law claims and state-law claims in the case 'derive from a common nucleus of operative fact' and are 'such that a plaintiff would ordinarily be expected to try them all in one judicial proceeding.'"  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349 (1988) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)) (brackets omitted).  As indicated in Section II above, and as will become more evident from the discussion below, Ms. Mumma's common-law, state-law claims share a "common nucleus of operative fact" with her Section 31-51q claim.

### B.    The Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party "bears the initial burden of demonstrating the absence of any genuine factual issues."  *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  If it meets that burden, "the non-moving party is obligated to produce probative evidence supporting its view that a genuine factual dispute exists."  *Id.*  To do so successfully, the non-moving party "must do more than simply show that there is

some metaphysical doubt as to the material facts;" it must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original).

In deciding a motion for summary judgment, the court must not decide *bona fide* factual disputes.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  The court's "duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."  *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).  And in performing its issue-finding function, the court must "assess the record in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor."  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (brackets omitted) (citing *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 177 (2d Cir. 1990)).

Genuine disputes of material fact warrant denial of a motion for summary judgment.  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  "If there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied."  *Am. Home Assur. Co. v. Hapag Lloyd Container Line, GmbH*, 446 F.3d 313, 315 (2d Cir. 2006) (internal quotations and brackets omitted) (citing *Marvel Characters Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002)).

C.        Count One:  Conn. Gen. Stat. § 31-51q

At the time of Ms. Mumma's termination, Section 31-51q of the Connecticut General

Statutes provided that:

> Any employer . . . who subjects any employee to discipline or discharge on account
> of the exercise by such employee of rights guaranteed by the first amendment to
> the United States Constitution or section 3, 4 or 14 of article first of the Constitution
> of the state, provided such activity does not substantially or materially interfere
> with the employee's bona fide job performance or the working relationship between
> the employee and the employer, shall be liable to such employee for damages cause
> by such discipline or discharge, including punitive damages, and for reasonable
> attorney's fees as part of the costs of any such action for damages.

Conn. Gen. Stat. § 31-51q (2020), *amended by* Pub. Act. 22-24, § 1 (2022).[2]  The statute thus

"extends protection of rights of free speech under the federal and state constitutions to employees

in the private workplace.  The statute is not limited to freedom of speech in the public arena."

*Campbell v. Windham Cmty. Mem. Hosp., Inc.*, 389 F. Supp. 2d 370, 381 (D. Conn. 2005) (quoting

*Cotto v. United Techs. Corp., Sikorsky Aircraft Div.*, 251 Conn. 1, 16 (1999)).

To establish a *prima facie* case under Section 31-51q, the plaintiff must show "(1) that she

engaged in constitutionally protected speech, (2) that her employer took an adverse action against

her, and (3) that there was a causal relationship between the protected activity and the adverse

action."  *Blue v. City of New Haven*, No. 3:16-cv-1411 (MPS), 2019 WL 399904, at *8 (D. Conn.

Jan. 31, 2019) (citing *Karagozian v. Luxottica Retail N. Am.*, 147 F. Supp. 3d 23, 35 (D. Conn.

2015)) (internal quotations and brackets omitted).  Establishing these elements requires, among

other things, a showing that "the speech at issue was made as a citizen on matters of public concern

---

[2]        The statute has since been amended to prohibit employers from disciplining employees for
refusing to attend so-called "captive audience meetings" – that is, meetings where "the primary
purpose of which is to communicate the employer's opinion concerning religious or political
matters."  *See* Conn. Gen. Stat. § 31-51q (amended 2022).  The amendment also deleted the
punitive damage element.  *Id.*  Neither party contends that the amendment is relevant to Thrive's
summary judgment motion.

rather than as an employee on matters of personal interest." *Baldyga v. City of New Britain*, 554 F. Supp. 2d 268, 278 (D. Conn. 2008) (citing *Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir. 2003)); *see also Nyenhuis v. Metro. Dist. Comm'n*, No. 3:08-cv-69 (AWT), 2011 WL 2618965, at *4 (D. Conn. July 1, 2011).  "Speech is in a matter of public concern if [it] relates 'to any matter of political, social, or other concern to the community.'" *Baldyga*, 554 F. Supp. 2d at 278 (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)); *see also Daley v. Aetna Life & Cas. Co.*, 249 Conn. 766, 779 (1999).  The plaintiff must also show that "the speech was at least a substantial or motivating factor in the adverse employment action."  *Manning*, 2022 WL 2791858, at *13 (quoting *Lynch v. Ackley*, No. 3:12-cv-537 (JBA), 2012 WL 6553649, at *8 (D. Conn. Dec. 14, 2012)).

In this case, Thrive concedes that Ms. Mumma has satisfied these three elements.  It acknowledges that her Facebook post "touch[ed] on matters of public concern." (Defs.' Mem. at 18); *see also Meriwether v. Hartop*, 992 F.3d 492, 506 (6th Cir. 2021) (holding that speech that "touch[es] on gender identity" implicates "a hotly contested matter of public concern").  It also admits – as it must – that she "experience[d] an adverse employment action" when it terminated her employment.  (Defs.' Mem. at 18); *see also Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225-26 (2d Cir. 2006) ("In the context of a First Amendment retaliation claim, . . . adverse employment actions include discharge[.]") (brackets omitted).  And it concedes that her speech "was a motivating factor in the adverse employment action." (Defs.' Mem. at 18.)  As noted in Section II above, Ms. Shields testified that Ms. Mumma "was separated for posting material to her Facebook page, specifically, two boxes contained within a meme that was offensive and did not comply with [Thrive's] employee handbook standards, our values, and showed disregard for diversity, equity, and inclusion." (T. Shields Depo. Tr., ECF No. 49-13, at 11:7-12.)  When asked

straight-up whether "it was the posting of the meme . . . that led to Candice being terminated by Thrive," Ms. Shields answered, "Correct." (*Id.* at 82:11-15.) Dr. Moore similarly testified that "Candice posted something to social media that was offensive and derogatory towards multiple groups of people, and that's why she was terminated." (C. Moore Depo. Tr., ECF No. 49-14, at 87:7-12.)

A successful Section 31-51q claim requires more than proof of these three elements, however; it also requires that the employee's exercise of her free speech rights "not substantially or materially interfere with [her] bona fide job performance or the working relationship" with the employer. Conn. Gen. Stat. § 31-51q. Courts have addressed this "interference" element in different ways. Some have imposed upon the plaintiff the burden to plead and prove a lack of interference. *E.g., Coffy v. State*, No. FBT-CV-20-6094937-S, 2021 WL 3127088, at *3 (Conn. Super. Ct. June 18, 2021). Others have treated the interference element as a special or affirmative defense, placing the burden on the employer. *E.g., Matthews v. Dep't of Pub. Safety*, No. HHD-CV-11-6019959-S, 2013 WL 3306435, at *10 (Conn. Super. Ct. May 31, 2013). Still others have applied a *McDonnell Douglas* burden-shifting framework, requiring the employer to produce evidence of interference or disruption and, if it does so, looking to the employee to come forward with evidence that the proffered explanation is pretextual. *E.g., Kordick v. Town of Greenwich*, No. FST-CV-20-6047359-S, 2022 WL 17428855, at *7 (Conn. Super. Ct. Nov. 29, 2022). Finally, courts also apply the balancing test articulated by the United States Supreme Court in *Pickering v. Board of Education,* 391 U.S. 563 (1968). *E.g., Karagozian*, 147 F. Supp. 3d at 37; *Douglas v. Mystic Motor Inn*, No. KNL-CV-13-6018304, 2013 WL 7084791, at *7 (Conn. Super. Ct. Dec. 31, 2013).

In applying the *Pickering* test, courts seek to balance the employee's free speech rights with the employer's interest in workplace efficiency. *Connick*, 461 U.S. at 142 (1983) (citing *Pickering*, 391 U.S. at 568). Under *Pickering*, "several factors are relevant, including: 'the extent of the disruption caused by the employee's speech on (1) workplace discipline, (2) harmony among co-workers, (3) working relationships, (4) the employee's job performance, (5) the responsibilities of the employee within the agency and (6) whether the speech is made publicly or privately. …'" *Schumann v. Dianon Sys., Inc.*, 304 Conn. 585, 623-24 (2012) (quoting *Dangler v. New York City Off Track Betting Corp.*, 193 F.3d 130, 139 (2d Cir. 1999)). This list of factors is not exclusive, because "[a] single, mechanical test will not do for a salmagundi of challenges, involving both on- and off-duty speech, job-related and not, spoken in protest, for laughs, or, as often, just because." *Locurto v. Giuliani*, 447 F.3d 159, 173 (2d Cir. 2006).

In the context of public employee claims under the First Amendment, courts have held that the employer need not come forward with evidence of actual disruption to prevail on the *Pickering* test. *E.g.*, *Piscottano v. Murphy*, 511 F.3d 247, 271 (2d Cir. 2007) ("Evidence that . . . harms or disruptions have in fact occurred is not necessary."). Rather, "[t]he employer need only make a reasonable determination that the employee's speech creates the potential for such harms." *Id.* As the Supreme Court has observed, there is no requirement than an employer "allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick*, 461 U.S. at 152.

Where, as here, the employer cites workplace disruption as its legitimate reason for its employment action (Opp'n at 18-19), the *McDonnell Douglas* and *Pickering* analyses overlap in one respect. In allowing the plaintiff an opportunity to show that the employer's proffered reasons are pretextual, the *McDonnell Douglas* framework of course considers whether disruption was the

true reason for the termination. *See Neal v. Specialty Cable Corp.*, No. 3:21-cv-497 (SALM), 2022 WL 4584082, at *9 (D. Conn. Sept. 29, 2022) (considering, in a Section 31-51q case, whether the "legitimate reasons offered by the defendant were not its true reasons, but were a pretext for retaliation") (brackets and citation omitted). And the *Pickering* analysis likewise considers whether the employer truly disciplined the employee *because of* the disruption, and not because of the content of her speech. As the Second Circuit has explained in the First Amendment/public employee context, when it is "undisputed . . . that the plaintiffs' expressive activity was the motivating factor behind their dismissals," the *Pickering* test imposes upon the employer the burden to show that it "acted in response to [the] likely interference and not in retaliation for the content of the speech." *Locurto*, 447 F. 3d at 175-76. Stated differently, it "must be the case, of course, that the concern for disruption, rather than some other, impermissible motive, was the actual reason for the adverse employment action." *Id.* at 180 (citing *Sheppard v. Beerman*, 94 F.3d 823, 827 (2d Cir. 1996)).

In this case, Thrive argues that there are no genuine, material factual disputes to be tried on the interference prong under any of the available modes of analysis. (Opp'n at 18.) It claims that, if the Court follows cases like *Coffy* and "assigns Plaintiff the burden of proof that her speech did not substantially or materially interfere with her bona fide job performance or with her working relationship with her employer, she cannot provide evidence to support that contention so her claim should fail." (*Id.*) It then argues that "[i]f the Court applies the *McDonnell Douglas* test," it has "provided uncontroverted evidence . . . of a legitimate, non-retaliatory explanation" that Ms. Mumma cannot rebut; it says that "Plaintiff's posting prompted several complaints that it was racially and gender identity offensive," and generated "concerns about its impact on relationships within the recruiting team and perceptions of the company by the public, particularly potential job

candidates." (*Id.* at 18-19.)  And it contends that the *Pickering* test breaks in its favor, because "[t]he undisputed evidence makes clear that the Plaintiff's public posting disrupted harmony among her co-workers and caused concern about ongoing work relationships, as well as her ability to continue to execute her responsibilities as a recruiter dealing with the public on behalf of the company." (*Id.* at 19.)

The Court begins its analysis of this argument by declining to apply the *Coffy* approach.  It acknowledges that the question of who bears the burden on the interference element has yet to be decided by a Connecticut appellate court.  *Matthews*, 2013 WL 3306435, at *8.  But "[w]here the substantive law of the forum state is uncertain or ambiguous, the job of the federal courts is carefully to predict how the highest court of the forum state would resolve the uncertainty or ambiguity."  *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994).  As Judge Shea did in *Blue*, this Court "predict[s] that the Connecticut Supreme Court would place the burden on the defendant for substantially the same reasons set forth by Judge Peck in *Matthews*."  2019 WL 399904, at *10.

In *Matthews*, Judge Peck carefully analyzed the language of Section 31-51q and concluded that the statute's interference element was expressed in a proviso rather than an exception – and longstanding principles of statutory construction dictate that "matter in a *proviso* can be left for the adversary as a defensive matter."  2013 WL 3306435, at *10 (quoting Sutherland Statutory Constr. § 21:11) (emphasis in original).  Even more persuasively, she pointed out the practical problems that would arise if the rule were otherwise.  "[I]f [the plaintiff] were required to prove a lack of a substantial and material interference, he would be forced to prove a negative, which is a difficult if not impossible task."  *Id.* (citing *Arrowwood Indem. Co. v. King*, 304 Conn. 179, 203 (2012)); *see also Jansson v. Stamford Health, Inc.*, No. 3:16-cv-260 (CSH), 2017 WL 1289824, at

\*11 (D. Conn. Apr. 5, 2017) (observing that, since the interference element "necessarily alleges a negative . . . courts have held that it is the defendant's burden to prove its inaccuracy").  "This would place the court in the peculiar position of requiring the plaintiff to plead either an extensive and exhaustive recitation of all events that may have involved interference or a boilerplate that would not give sufficient factual detail and would likely involve a legal conclusion." *Matthews*, 2013 WL 3306435, at \*10.  Because the employer "has a wider and better knowledge of disruptive events," "it makes more sense that it is the defendant's burden to prove a substantial and material interference." *Id.*

While *Coffy* contains a discussion of the proviso/exception distinction, it does not contend with Judge Peck's observations about the practicalities, and it is unpersuasive for that reason.  2021 WL 3127088, at \*2-3.  The *Coffy* court analogized Section 31-51q to Connecticut's dog bite statute, which imposes liability on the owner or keeper for damage done by a dog "except where such damage shall have been occasioned to the body or property of a person who, at the time such damage was sustained, was committing a trespass or other tort." *Id.*, at \*2 (quoting Conn. Gen. Stat. § 3357 (1930), now Conn. Gen. Stat. § 22-357).  Observing that Connecticut has long placed the burden on dog bite plaintiffs to plead and prove that they were not committing a tort at the time they were bitten, and concluding that the dog bite statute and Section 31-51q are similarly constructed, the *Coffy* court held that "the plaintiff bears the burden of pleading and proving the non-existence of the material interference element of [Section] 31-51q." *Id.* (citing *Goodwin v. Giovenelli*, 117 Conn. 103 (1933)).  But dog bite plaintiffs and Section 31-51q claimants are not similarly situated; whereas the former likely knows whether he was committing a tort at the time he was attacked, the latter almost invariably does not have the same "knowledge of disruptive events" as the employer. *Matthews*, 2013 WL 3306435, at \*10.  Because *Coffy* and the other cases

cited by Thrive do not address the practical considerations identified in *Matthews*, the Court predicts that the Connecticut Supreme Court would not follow them.

Proceeding, then, to a *McDonnell Douglas* analysis, the Court sets out some familiar principles.  "Under *McDonnell Douglas*, once a plaintiff demonstrates a prima facie case, the defendant is obligated to produce evidence 'which, *taken as true*, would *permit* the conclusion that there was a non-retaliatory reason for the adverse action.'"  *LaFond v. Gen. Physics Servs. Corp.*, 50 F.3d 165, 174 (2d Cir. 1995) (quoting *Gallo v. Prudential Residential Servs., Ltd. P'Ship*, 22 F. 3d 1219, 1226 (2d Cir. 1994)) (emphasis in original) (brackets and citation omitted).  If the defendant does so, "then the burden shifts back to the employee to show that the employer's articulated reason is pretext for discrimination." *Truitt v. Salisbury Bank & Tr. Co.*, 52 F.4th 80, 86-87 (2d Cir. 2022) (citing *McDonnell Douglas*, 411 U.S. 792, 804-05 (1973)).  "Pretext may be demonstrated either by the presentation of additional evidence showing that 'the employer's proffered explanation is unworthy of credence' . . . or by reliance on the evidence comprising the prima facie case, without more[.]"  *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 38 (2d Cir. 1994) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

Applying these principles to this case, the Court concludes that there are genuine disputes of material fact on the issue of pretext that preclude summary judgment.  Thrive's proffered non-retaliatory reason for terminating Ms. Mumma is that her Facebook post "potentially violated anti-harassment law, violated company policy, and negatively impacted company operations."  (Defs.' Mem. at 19.)  But when asked at her deposition to state the reason for the termination, Dr. Moore did not say this.  She instead testified that Thrive terminated Ms. Mumma because she "posted something to social media that was offensive and derogatory to multiple groups of people."  (Depo. Tr. of C. Moore, ECF No. 49-14, at 87:7-12.)  While the doctor was "concern[ed]" about the effect

of the post on workplace relationships (*id.* at 114:12-15), she did not cite potential impacts on company operations or fear of legal liability as the actual reasons for the termination.  (*Id.* at 87:7-12.)

Ms. Shields' testimony more closely resembled what Thrive claimed in its brief, but even her testimony is not sufficiently clear to support dismissing Ms. Mumma's Section 31-51q claim on summary judgment.  Ms. Shields testified that "Candice was separated for posting material to her Facebook page . . . that was offensive and did not comply with our employee handbook standards, our values, and showed disregard for diversity, equity, and inclusion." (Depo. Tr. of T. Shields, ECF No. 49-13, at 11:7-12.)  But it would require an inferential step to conclude that non-compliance with employee handbook standards or disregard for diversity, equity and inclusion equals concern for potential legal liability or a negative impact on company operations, and on summary judgment the inferences are drawn against Thrive, not for it.  *Crawford v. Metro Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 274 n.1 (2009).  The common thread in Ms. Shields' and Dr. Moore's comments is that the company regarded Ms. Mumma's speech as "offensive," and while a reasonable jury could infer that that this is a form of shorthand for concern about the disruption that might flow from an offensive meme, it could also conclude on the current record that Thrive was simply offended by the content of the speech.

Thrive phrased its explanation somewhat differently in its reply brief, but with this explanation too, genuine disputes of material fact exist.  In its reply, Thrive claimed to have "terminated Ms. Mumma because of actual complaints from co-workers and reasonable concerns about her posting's negative impact on relationships within the recruiting team and perceptions of the company by the public." (Defs.' Reply, ECF No. 57, at 7.)  Yet with respect to co-workers on the recruiting team, the summary judgment record contains sufficient evidence for a reasonable

jury to conclude that this explanation is pretextual.  While some co-workers complained about the Facebook meme, none asked Thrive to take any specific action, let alone termination.  Lee Pitts did not "specifically ask for something to be done."  (Depo. Tr. of C. Moore, ECF No. 49-14, at 95:13-18.)  Sarah Lisak likewise "did not express specific requests for action to be taken."  (*Id.* at 97:10-11.)  Christine Markulis did not ask for Ms. Mumma to be disciplined (*id.* at 98:25-99:2), and Kendra Williams similarly did "not expect any action."  (Defs.' Ex. 6, ECF No. 49-8.)  Of course, an employer may act against harassing conduct without first being asked to do so by its employees.  But where, as here, the employer contends that it terminated an employee *because of* complaints about the employee's speech, it is relevant that the complainants did not request any action.  Under the circumstances of this case, a jury could reasonably conclude that Ms. Mumma was terminated not because of the disruption caused by her speech, but rather for the speech itself.  (*See* Depo. Tr. of T. Shields, ECF No. 49-13, at 11:7-12.)

Thrive points to a negative "impact on relationships within the recruiting team" (Defs.' Mem. at 18), but the record contains scant evidence of even potential impacts, and no co-worker stated that he or she would be unable to work with Ms. Mumma in the future.  Dr. Moore discussed the meme with the principal complainants, and at her deposition she testified that "none of them expressed to me directly that they would not be able to work with Candice going forward."  (C. Moore Depo. Tr., ECF No. 54-4, at 112:22-113:12.)  While she testified that Lee Pitts said to her that it "would be very difficult for him to . . . see [Candice] in the same . . . light," and felt that their "good working relationship" was "going to be difficult to maintain going forward," Dr. Moore nonetheless could not remember him "specifically saying that [he] could no longer work with Candice."  (*Id.*)  The doctor claimed to be concerned that "members of the team would not be able to work closely with her, trust her, have a good, open working relationship with her" (*id.* at 114:12-

15), but with only Mr. Pitts' ambiguous comment for support, a jury could reasonably conclude that the concern was pretextual.  Moreover, when asked why they terminated Ms. Mumma, neither Dr. Moore nor Ms. Shields expressly cited "impacts on relationships with the recruiting team." They instead cited the offensiveness of the speech; its inconsistency with corporate policy and values; and its disregard for diversity, equity, and inclusion.  (T. Shields Depo. Tr., ECF No. 49-13, at 11:7-12; C. Moore Depo. Tr., ECF No. 49-14, at 87:7-12.)

Thrive also points to "perceptions of the company by the public, particularly potential job candidates" (Defs.' Mem. at 18-19), but here too, factual disputes exist.  Thrive concedes that Ms. Mumma did not use Facebook to "friend" or otherwise contact recruiting candidates.  (Hrg. Tr., ECF No. 61, at 21:1-3.)  Ms. Mumma states that her Facebook page "has nothing to do with THRIVE on there," and that although it is not a "private" page, no one who viewed it would connect her with Thrive because (among other reasons) it "[does] not have any pictures of me in THRIVE gear on there." (Defs.' Ex. 8, ECF No. 49-10, at 4.)[3]  Dr. Moore evidently disagrees; she recalled looking at Ms. Mumma's page and observing references to Thrive.  (Depo. Tr. of C. Moore, ECF No. 49-14, at 92:19-21.)  But this factual disagreement makes the issue inappropriate for resolution on summary judgment.

---

[3]     Defendants' Exhibit 8 is Ms. Mumma's journal.  It is unsworn, and as such, it would ordinarily have been inadmissible on summary judgment.  *See* Fed. R. Civ. P. 56(c).  But the Defendants affirmatively placed it into the summary judgment record for their own reasons, and at oral argument they conceded that the entire journal is "fair game for [the Court] in considering the motion."  (Hrg. Tr., ECF No. 61, at 17:16 – 18:1.)

After her termination, Ms. Mumma posted on Facebook that she "was fired from THRIVE Affordable Vet Care for [her] political views, the word Indian, & believing in 2 genders." (Defs.' Ex. 9, ECF No. 49-11.)  Because that posting used the word "THRIVE," some viewers associated it with the company.  (*See id.*)  But the question of whether viewers did, or reasonably could have been expected to, associate the initial Jenner/Warren meme with the company is disputed.

These factual disputes also bar summary judgment under the *Pickering* balancing test.  "As a general rule, the application of the balancing test is a question of law which is properly performed by the district court."  *Gorman-Bakos v. Cornell Co-op. Ext. of Schenectady Cty.*, 252 F.3d 545, 557 (2d Cir. 2001).  But summary judgment is inappropriate in cases "in which the question of the degree to which the employee's speech could reasonably have been deemed to impede the employer's efficient operation would properly be regarded as a question of fact, to be answered by the jury[.]"  *Id.* at 558 (citing *Vasbinder v. Ambach*, 926 F.2d 1333, 1340 (2d Cir. 1991)).  Here, the above-referenced factual disputes bear on several of the core *Pickering* factors.  For example, Thrive says that co-worker harmony and working relationships were or could have been impacted, but Ms. Mumma says – with citations to admissible evidence – that none of her co-workers "indicated that they could no longer work with her."  (Pl.'s L.R. 56(a)2 Stmt., ECF No. 54, ¶ 47) (citing Depo. Tr. of C. Moore, ECF No. 54-4, at 94-98, 112-13).)  Thrive also says that Ms. Mumma's post was sufficiently public to cause the sixth *Pickering* factor – "whether the speech is made publicly or privately," *Schumann*, 304 Conn. at 624 – to break in its favor, but as noted above, there is a factual dispute as to the likelihood of the public seeing the post and associating it with the company.  More fundamentally, there are genuine disputes on the question of whether "concern for disruption, rather than some other, impermissible motive, was the actual reason for the adverse employment action."  *Locurto*, 447 F.3d at 180.  Thrive's motion for summary judgment will be denied as to Count One.

D.     **Counts Two and Three:  Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing**

In her complaint, Ms. Mumma referenced four provisions of the Thrive employee handbook.  The first was Thrive's "Open Door policy," which stated that "open communication is essential to a successful work environment and all employees should feel free to raise issues of

concern without fear of reprisal."  (Compl., ECF No. 1, ¶ 68.)  The second was the "Professional Environment" policy, which expressly "encouraged" "[t]olerance of others."  (*Id.* ¶ 69.)  Third, Thrive's "Employee Conduct" policy included "dozens of examples of conduct that is inappropriate;" Ms. Mumma says that "the acts . . . that lead [sic] to her termination" were not among those examples.  (*Id.* ¶ 70.)  Finally, the handbook "include[d] a progressive discipline policy" which Ms. Mumma says "was not applied" in her case.  (*Id.* ¶ 71.)

In Counts Two and Three of her complaint, Ms. Mumma alleged that the parties contracted to follow these and other provisions of the handbook.  Count Two is an express claim for breach of contract; in it, Ms. Mumma alleged that "[a]n understanding and/or agreement existed between the Plaintiff and the Defendants that each would abide by the terms and conditions set forth in the THRIVE Employee Handbook and that the provisions of said Handbook would govern the terms and conditions of employment."  (*Id.* ¶ 66.)  Count Three is a claim for breach of the implied covenant of good faith and fair dealing, in which Ms. Mumma alleged that Thrive undertook "discretionary acts of discipline against the plaintiff in violation of the terms of the Handbook between the parties or the spirit of the agreement."  (*Id.* ¶ 76.)  Between the two counts, Ms. Mumma substantially alleged that Thrive broke both an express promise and "the spirit of the agreement" by (1) firing her for "rais[ing] issues" that concerned her; (2) refusing to show "tolerance" for her conservative Christian beliefs; (3) firing her for actions that were not identified as potential termination offenses in the Employee Conduct policy; and (4) proceeding straight to termination without first applying progressive discipline.

In its summary judgment memorandum, Thrive pointed out that the same handbook "explicitly stated that it was not a contract and that the [employment] relationship was 'at-will.'" (Defs.' Mem., ECF No. 49-1, at 27.)  Indeed, the first two sentences of the handbook read:  "This

Employee Handbook is not an employment contract.  **Unless you have a written contract providing otherwise, your relationship with THRIVE is 'at-will' and may be terminated at any time by either you or THRIVE, with or without prior notice or warning, and with or without cause or reason.**"  (Ex. 2 to Defs.' Mem., at 6) (emphasis in original).  And presumably anticipating claims that the other provisions of the handbook somehow undermined the at-will principle, Thrive went on to say in the very next sentence that "[n]othing in this manual will limit your right or the Company's discretionary right to terminate your employment relationship."  (*Id.*)  At her deposition, Ms. Mumma testified that she knew she was an "at-will" employee, and that "at-will" meant that "THRIVE may terminate your employment at any time with or without cause." (Depo. Tr. of C. Mumma, ECF No. 49-12, at 44:22-45:12; *see also* Pl.'s Local Rule 56(a)2 Stmt., ECF No. 54, ¶ 2.)

　　Ms. Mumma now concedes that these facts compel dismissal of Count Two's contract breach claim, but she argues that Count Three's claim for breach of the implied covenant of good faith and fair dealing can survive independently.  (Opp'n at 21-24.)  While admitting that the handbook "did not create an express contract," she asserts that "the defendants did agree, as part of the employee relationship, to act in accordance with the terms of the Handbook, albeit with some discretion." (*Id.* at 23.)  She further asserts that, having invested itself with discretion, Thrive was obliged by the implied covenant to exercise that discretion in good faith.  (*See id.*)  She argues that, in terminating her in violation of an important public policy, Thrive could not have been acting in good faith – or, at a minimum, that a jury must decide the issue.  (*Id.* at 23-24.)  The Court disagrees.

　　It is axiomatic that "[a]ll contracts carry 'an implied covenant of good faith and fair dealing,' which requires both parties to refrain from doing 'anything that will injure the right of the other to

receive the benefits of the agreement.'" *Kaufman LLC v. Estate of Feinberg*, No. 3:13-cv-1259 (VAB), 2021 WL 4916803, at *18 (D. Conn. Sept. 13, 2021) (quoting *Hudson United Bank v. Cinnamon Ridge Corp.*, 81 Conn. App. 557, 576 (2004)); *see also Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 794 (2013). Yet since the covenant "is a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended," it "cannot be applied to achieve a result contrary to the clearly expressed terms of a contract." *Magnan v. Anaconda Indus., Inc.*, 193 Conn. 558, 567 (1984).

An implication of this principle is that the covenant "is not generally applicable to termination claims in the context of an at-will employment contract." *Scaife v. City of Meriden*, 493 F. Supp. 3d 1, 15 (D. Conn. 2020) (citing *Magnan*, 193 Conn. at 571). "A covenant of good faith should not be implied as a modification of an employer's right to terminate an at-will employee because even a whimsical termination does not deprive the employee of benefits expected in return for the employee's performance." *Geysen v. Securitas Sec. Servs. USA, Inc.*, 322 Conn. 385, 405 (2016). Stated differently, "[w]here employment is clearly terminable at will, a party cannot ordinarily be deemed to lack good faith in exercising that right." *Magnan*, 193 Conn. at 572.

To be sure, "[a]n exception to that rule exists when the termination of an at-will employee violates some important public policy." *Scaife*, 493 F. Supp. 3d at 15 (citing *McKinstry v. Sheriden Woods Health Care Ctr., Inc.*, 994 F. Supp. 2d 259, 267 (D. Conn. 2014)). "But the exception is narrow and does not apply if an adequate statutory remedy exists by which the public policy violation can be enforced." *Id.* (citing *Burnham v. Karl and Gelb, P.C.*, 252 Conn. 153, 158 (2000)). In *Burnham*, the Connecticut Supreme Court observed that "[a] finding that certain conduct contravenes public policy is not enough by itself to warrant the creation of a contract

remedy for wrongful dismissal by an employer." 252 Conn. at 159 (quoting *Atkins v. Bridgeport Hydraulic Co.*, 5 Conn. App. 643, 648 (1985)). Courts have allowed such a remedy only when "the employee was *otherwise without remedy* and that permitting the discharge to go unredressed would leave a valuable social policy to go unvindicated." *Id.* at 159-60 (quoting *Atkins*, 5 Conn. App. at 648) (emphasis in original). Because the plaintiff in *Burnham* had a statutory remedy available to her under Conn. Gen. Stat. § 31-51m, the Supreme Court affirmed the dismissal of her common-law claim. *Id.* at 161-62.

Judge Young recently applied this principle in striking a claim that was like Ms. Mumma's in all relevant respects. In *Gills v. City of New London*, a municipal employee claimed to have been constructively discharged for speaking up about issues of public concern. No. KNL-CV-20-6047731-S, 2021 WL 5112985, at *5 (Conn. Super. Ct. Oct. 15, 2021). He pled both a violation of Conn. Gen. Stat. § 31-51q and a breach of the covenant of good faith and fair dealing. *Id.* at *1, 4. Citing *Burnham* and *Campbell v. Plymouth*, 74 Conn. App. 67, 73-76 (2002), Judge Young observed that when a plaintiff has an available statutory remedy, he is "precluded from pleading any alternative, common-law cause of action including breach of good faith and fair dealing." *Id.* at *2. Because Section 31-51q gave Gills a vehicle for vindicating the important public policy implicated in his claim, he was "precluded from bringing a breach of the covenant of good faith and fair dealing claim based on that policy." *Id.* at *3.

The same principles apply here. Section 31-51q provides Ms. Mumma with a statutory vehicle for vindicating her free speech rights. Dismissing her implied covenant claim will not leave her without a remedy. The Court will therefore grant summary judgment to Thrive on Counts Two and Three of the complaint.

### E.     Count Four:  Negligent Misrepresentation

Under Connecticut law, "an action for negligent misrepresentation requires the plaintiff to establish (1) that the defendant made a misrepresentation of fact; (2) that the defendant knew or should have known was false; and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result."  *Nazami v. Patrons Mut. Ins. Co.*, 280 Conn. 619, 626 (2006) (citing *Glazer v. Dress Barn, Inc.*, 274 Conn. 33, 73 (2005)).  "For a negligent misrepresentation claim to move past summary judgment, a plaintiff must show a genuine question of material fact exists with respect to" each of those four elements.  *Learning Care Group, LLC v. Armetta*, No. 3:13-cv-1540 (VAB), 2016 WL 953212, at *11 (D. Conn. Mar. 11, 2016) (citing *Stuart v. Freiberg*, 316 Conn. 809, 821-22 (2015)).

In Count Four of her complaint, Ms. Mumma alleged that Thrive "made numerous representations of fact . . . that were false and misleading, including assuring [her] that she was free to express her political and personal opinions in the workplace and otherwise without repercussions."  (Compl., ECF No. 1, ¶ 79.)  She added that Thrive "knew or should have known that these representations were false," and that she "reasonably relief upon" them.  (*Id.* ¶¶ 80, 81.)  She also pled that she "suffered pecuniary harm as a result of her reliance on those representations."  (*Id.* ¶ 82.)

Thrive met its initial summary judgment burden by pointing out that Ms. Mumma "was expressly advised that she was an 'at will' employee and . . . knew that to be the case."  (Defs.' Mem. at 27.)  It came forward with her sworn deposition testimony, in which she acknowledged that "at will' means that THRIVE may terminate your employment at any time with or without cause."  (*Id.*) (citing Depo. Tr. of C. Mumma, ECF No. 49-12, at 46).  Thrive having met its initial

burden, it was incumbent upon Ms. Mumma to come forward with probative evidence on the required elements of a negligent misrepresentation claim.  She has failed to do so.

Ms. Mumma says in her brief that "[t]he defendants made assurances that [she] was free to express her political and personal opinions in the workplace and otherwise without repercussions" (Pl.'s Mem. at 21), but she cites no admissible evidence in support of that claim.  Rather, it appears to be a mere inference that she drew from the fact that "her coworkers posted about their personal beliefs on Facebook without repercussion."  (*Id.*; *see also* C. Mumma Depo. Tr., ECF No. 54-1, at 144) (stating that other employees "were allowed to and continue to be allowed to express their views on social media in regards to protected classes and have not been terminated").  Yet even if these sorts of inferences could qualify as "representations" – and Ms. Mumma cites no authority for that proposition – she would have to show that Thrive knew or should have known at the time that it made them that it would not follow through.  *Doe v. Wesleyan Univ.*, No. 3:19-cv-1519 (JBA), 2021 WL 664010, at *12 (D. Conn. Feb. 19, 2021) (dismissing negligent misrepresentation claim in part against a university arising out of its student handbook because "Plaintiff failed to allege that [the university] knew or should have known that its representations were false at the time they were made").  Moreover, Ms. Mumma has come forward with no evidence that reliance on these representations would have been "reasonable" considering the "at will" provision of the employee handbook.  *Cf. Nazami*, 280 Conn. at 626-27 (affirming dismissal of a misrepresentation claim that conflicted with the terms of a written certificate of insurance).  The Court will grant summary judgment to Thrive on Count Four.

### F.    Count Five:  Intentional Infliction of Emotional Distress

In Count Five, Ms. Mumma asserts a claim for intentional infliction of emotional distress. (Compl., ECF No. 1, ¶¶ 84-93.)  "Under Connecticut law, four elements must be established to prevail" on such a claim.  *Turner v. Conn. Lottery Corp.*, No. 20-cv-1045 (VAB), 2021 WL

4133757, at *14 (D. Conn. Sept. 10, 2021) (citing *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 210 (2000)).  First, the plaintiff must show "that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct."  *Appleton*, 245 Conn. at 210.  Second, she must establish "that the conduct was extreme and outrageous."  *Id.*  Third, she must show "that the defendant's conduct was the cause of [her] distress," and fourth, she must prove "that the emotional distress . . . was severe." *Id.*

The second element is not lightly satisfied.  "Liability for intentional infliction of emotional distress requires conduct that exceeds 'all bounds usually tolerated by decent society.'"  *Id.* (quoting *Petyan v. Ellis*, 200 Conn. 243, 254 n.5 (1986)).  "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Id.* at 210-11.  Conversely, "[c]onduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress."  *Id.* at 211 (quoting *Mellaly v. Eastman Kodak Co.*, 42 Conn. Supp. 17, 19 (1991)).  Disputes over the second element are often resolved by a motion for summary judgment, because "[w]hether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine." *Id.* at 210 (citing *Bell v. Bd. of Educ.*, 55 Conn. App. 400, 410 (1999)).  "Only where reasonable minds disagree does it become an issue for the jury."  *Id.* (citing *Bell*, 55 Conn. App. at 410).

Applying these principles to this case, the Court holds that Thrive's conduct was not so outrageous and extreme as to be regarded as atrocious and utterly intolerable in a civilized society. Ms. Mumma asserts that Thrive engaged in "extreme and outrageous conduct" when it "demanded

[she] refute her personal and political views." (Opp'n at 20.) She adds that, "by censuring [her] personal and political speech, the defendants singled out the plaintiff for her beliefs." (*Id.*) She argues that "[v]iolating a person's First Amendment rights and demanding that they refute deeply held personal and political beliefs is extreme and/or outrageous conduct, which a person should know is likely to cause emotional distress." (*Id.*) But she cites no authority for the proposition that this sort of conduct supports the second element of the tort, and indeed the authorities are to the contrary. In *Downing v. West Haven Board of Education*, for example, a school administrator instructed a teacher to cover up or change out of a "Jesus 2000" t-shirt – certainly no less of a "demand[]" for "refut[ation]" of "personal . . . views" than Ms. Mumma experienced here. 162 F. Supp. 2d 19, 23 (D. Conn. 2001). The court nonetheless held that "[n]o reasonable juror could conclude that the defendants' conduct was atrocious and exceeded all bounds usually tolerated by decent society." *Id.* at 34. The same is true here; no reasonable juror could conclude that asking Ms. Mumma to take down a Facebook post is entirely beyond the civilized pale. Thrive is entitled to summary judgment on the intentional infliction of emotional distress claim in Count Five.

### G.   Count Six: Negligent Infliction of Emotional Distress

Finally, Ms. Mumma asserts a claim for negligent infliction of emotional distress in Count Six. Like its intentional cousin, the tort of negligent infliction of emotional distress has four elements. First, the plaintiff must show that "the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress." *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 444 (2003). Second, the plaintiff must demonstrate that her "distress was foreseeable." *Id.* Third, she must establish that "the emotional distress was severe enough that it might result in illness or bodily harm," and fourth, she must prove that "the defendant's conduct was the cause of [her] distress." *Id.*

In the employment setting, a negligent infliction of emotional distress claim is cognizable only when it arises out of "unreasonable conduct of the defendant in the termination process." *Parsons v. United Techs. Corp., Sikorsky Aircraft Div.*, 243 Conn. 66, 88 (1997). Because many of the ordinary incidents of workplace life – performance evaluations, demotions, denials of advancement, *etc*. – can be inherently distressing, "it is clear that individuals in the workplace reasonably should expect to experience some level of emotional distress, even significant emotional distress, as a result of conduct in the workplace." *Perodeau v. City of Hartford*, 259 Conn. 729, 757 (2002). When the employer terminates the employee, however, "emotional distress that might result in illness or bodily harm is a foreseeable consequence of particularly egregious conduct involving [the] termination, which would, in turn, give rise to a duty to avoid such conduct." *Id.* at 755. Accordingly, an employer "may not be found liable for negligent infliction of emotional distress arising out of conduct occurring within a continuing employment context," but may be liable for egregious "conduct occurring in the termination of employment." *Id.* at 762-63.

To prevail in a claim for negligent infliction of emotional distress arising out of a termination, the plaintiff must show that the employer needlessly insulted, humiliated, or embarrassed her. "The mere termination of employment, even where it is wrongful, is . . . not, by itself, enough to sustain a claim for negligent infliction of emotional distress." *Parsons*, 243 Conn. at 88-89. "[T]he tort of negligent infliction of emotional distress focuses on the manner of discharge; whether the employer's conduct in the termination was unreasonable, not whether the termination of employment was unreasonable." *Mercado v. PRRC, Inc.*, No. 3:15-cv-637 (JBA), 2015 WL 6958012, at *5 (D. Conn. Nov. 10, 2015) (quoting *Martin-Glave v. Aventis Pharm.*, No. 3:03-cv-1482 (EBB), 2003 WL 23185867, at *5 (D. Conn. Dec. 11, 2003)). Thus, "[i]n order to

34

sustain a claim of negligent infliction of emotional distress in this setting," the plaintiff must show that her "actual discharge was done in an inconsiderate, humiliating or embarrassing manner." *Id.* (quoting *Copeland v. Home & Cmty. Health Servs., Inc.*, 285 F. Supp. 2d 144, 152 (D. Conn. 2003)) (internal quotations omitted).

To illustrate this principle with examples, one court allowed a negligent infliction of emotional distress claim to proceed when the plaintiff alleged that the terminating employer gratuitously called the police, who then handcuffed him in front of his co-workers. *Id.* at *5-6. Another court allowed a claim to proceed when the plaintiff alleged that the terminating employer needlessly publicized his firing and falsely accused him of dishonesty. *Mulkin v. Anixter, Inc.*, No. 3:03-cv-901 (RNC), 2004 WL 288806, at *2-3 (D. Conn. Feb. 10, 2004). Conversely, a court dismissed a negligent infliction of emotional distress claim when the plaintiff alleged that the employer refused to hear evidence and "mimicked her in an offensive manner;" the court observed that, "[w]hile this alleged conduct is tasteless, insensitive, and highly inappropriate . . . it does not rise to the level of conduct that is sufficiently wrongful that defendant should have realized that it involved an *unreasonable* risk of emotional distress." *Pecoraro v. New Haven Register*, 344 F. Supp. 2d 840, 847 (D. Conn. 2004) (citing *Montinieri v. S. New Eng. Tel. Co.*, 175 Conn. 337, 345 (1978)) (emphasis in original). And another court dismissed a negligent infliction of emotional distress claim when the plaintiff's lone argument was that "the discriminatory termination of employment in violation of federal law constitutes . . . unreasonable conduct." *Schug v. Pyne-Davidson Co.*, No. 3:99-cv-1493 (CFD), 2001 WL 34312877, at *7-8 (D. Conn. Dec. 10, 2001).

In this case, the summary judgment record contains no evidence of "inconsiderate, humiliating, or embarrassing" termination conduct. Thrive says that Ms. Shields used a standard script when conveying the termination decision (Defs.' Mem. at 10) (citing Depo. T. of T. Shields,

ECF No. 49-13, at 8-9), and Ms. Mumma's contemporaneous notes do not reflect the sort of gratuitously insulting or humiliating conduct alleged in *Mercado*, *Mulkin*, or similar cases. (Ex. 8 to Defs.' Mem., ECF No. 49-10, at 9-11.) In her opposition to Thrive's motion, Ms. Mumma asserts that "the defendants humiliated [her] by requesting that she refute her core belief system," and "discriminated against her based on her political views." (Opp'n at 17-18.) But this is just another way of saying that Thrive behaved wrongfully, and it is well established that mere wrongfulness is "not, by itself, enough to sustain a claim for negligent infliction of emotional distress." *Parsons*, 243 Conn. at 88-89. Thrive is entitled to summary judgment on the negligent infliction of emotional distress claim asserted in Count Six.

## IV.   CONCLUSION

For the reasons stated, the Defendants' motion for summary judgment (ECF No. 49) is denied as to Count One of the complaint, and granted as to Counts Two, Three, Four, Five, and Six. The parties shall file their Joint Trial Memorandum on or before February 3, 2023. A separate order will issue.

So ordered this 4th day of January, 2023, at Hartford, Connecticut.

*/s/ Thomas O. Farrish*
Hon. Thomas O. Farrish
United States Magistrate Judge